UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 08-10264-RWZ

UNITED STATES OF AMERICA

v.

BOBBY NELSON

ORDER ON MOTION TO SUPPRESS

March 6, 2009

ZOBEL, D.J.

Defendant Bobby Nelson ("Nelson") is charged with one count of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1).  He has moved to suppress all evidence that resulted from a police stop on June 2, 2008.  After an evidentiary hearing, I find the following facts.

I.    **Findings of Fact**

On Monday, June 2, 2008, at approximately 1:00 a.m., a police transmission was dispatched regarding gun shots heard in the area of Progressions Lounge in Brockton, Massachusetts.  Officers James Baroud ("Baroud") and David Dickinson ("Dickinson") were patrolling in downtown Brockton and responded to the call by driving towards Progressions.  Progressions is located on Montello Street, in the block between Petronelli Way (to the south) and Franklin Street (to the north).  As the officers drove towards Progressions (with Dickinson driving and Baroud in the front passenger seat), they heard another police transmission that a witness at the scene had identified the

shooter as a black male wearing a white t-shirt and black hat, last seen walking west on Petronelli Way with his arm around a female.  At that point Baroud and Dickinson approached the intersection of Main Street and Centre Street.  Main Street is one block west of Montello Street, and Centre Street is one block south of Petronelli Way.  The officers observed a group of two black men and several women walking west on Centre Street.[1]  Both of the black men were dressed in white t-shirts, and one was also wearing a black hat.[2]  The man wearing the black hat had his arm around one of the women.  Baroud observed the members of the group look in his direction and then turn right to walk north on Main Street towards Petronelli Way.

The officers pulled up alongside the group, got out of their car, and ordered the group to stop.  The women and the man with the black hat stopped; the other man paused briefly and then continued to walk north on Main Street.  Baroud went to the man with the black hat, subsequently identified as Emery Martin ("Martin") and pat-frisked him.  He found a folding pocket knife.  At the same time, Dickinson trotted towards the other man, subsequently identified as defendant Nelson.  Nelson was approximately 10 yards in front of Dickinson and continued to walk north on Main Street.  Dickinson twice ordered Nelson to stop, to no avail.  When Dickinson reached him, Nelson stopped and began to turn towards Dickinson.  Dickinson grabbed

---

[1] The officers differ in their recollection of the number of women in the group. Baroud did not remember the number, while Dickinson recalled that there were three. Another officer who subsequently arrived on the scene, Officer Scibetta, recalled two.

[2] It is unclear whether the other man was also wearing a hat.  Baroud recalled that the other man was wearing a white hat but the other officers did not have a specific recollection.

Nelson's arms and put them behind his head.  Dickinson moved to stand behind Nelson,  separated Nelson's legs and tilted Nelson backwards, towards him, in an attempt to keep Nelson slightly off-balance.[3]

Officer Stephen Scibetta ("Scibetta") also received the police transmissions and arrived on the scene moments after Dickinson and Baroud.  Scibetta approached Baroud as he was handcuffing Martin.  Baroud advised Scibetta that he did not need help and told him to assist Dickinson.  Around this time Baroud noticed that the women had begun to walk away, heading west towards Legion Parkway.  Scibetta approached Dickinson, as the latter seized Nelson's arms and placed them behind his head.  Scibetta, who was then facing Nelson, testified that he observed what appeared to be a gun stuffed into the right side of Nelson's waistband; he saw a "glimpse" or "flash" of silver near Nelson's waist, and could clearly see the outline of the gun's handle through Nelson's t-shirt.  Scibetta further testified that the outline of the gun's handle underneath Nelson's t-shirt became more discernable as Dickinson tilted Nelson backwards, and that it caught his attention because: (1) the handle was much higher than he would expect a cell phone or other device worn at the waist to be; and (2) he recognized the outline to be the handle of a gun.  Scibetta reached in and seized the object from Nelson's waistband; it was, in fact, a gun.  Dickinson did not see the gun until Scibetta seized it.  All three officers identified the gun as a .45 caliber pistol approximately eight and one-half to nine inches in length and with a thick handle.  (See

---

[3] Dickinson is approximately five and a half feet tall; Nelson is approximately six feet tall.  Dickinson demonstrated the above-described maneuver for the court during the evidentiary hearing.

Govt. Ex. 2.)

The white t-shirt Nelson wore that evening was authenticated during the evidentiary hearing.  During the same hearing, Nelson put the shirt on as part of a demonstration to show that no flash of silver could be seen.  The shirt is very large and reached near the middle of his thighs when Nelson's arms were at his side.  Even when Nelson placed his hands behind his head and leaned backwards, the hem of the shirt did not approach his waist.  However, when Nelson leaned backwards the waistband of his pants was visible through the shirt.  Given the shirt's length, I do not credit Scibetta's testimony that he saw a flash of silver at Nelson's waistband.  However, given the size of the gun and the fact that Nelson's waistband was visible through the shirt when he tilted backwards, I do credit Scibetta's testimony that he saw the outline of what appeared to be a gun under the shirt.

After the gun was seized, Baroud read Nelson his <u>Miranda</u>[4] rights and asked to see his license to carry a firearm.  Nelson admitted that he did not have a license.  He was taken back to the police station, where he made several other statements.

Baroud, Dickinson and Scibetta all described the area of Brockton where Progressions Lounge is located as a "high crime" area.  Baroud stated that the police have received many calls about fights in and outside of Progressions and recalled personally being called to Progressions more than five times during the five-year period he has served on the Brockton Police, including orders to investigate reports of gunshots.  Baroud also recalled a gun battle between the police and a suspect that had

---

[4] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

occurred near Progressions several months prior to June 2008.[5]   Dickinson recalled

several gun cases in the area, including shooting outside of Progressions (possibly the

same gun battle Baroud remembered) and a gunshot victim on Petronelli Way,

although he could not recall whether these events had occurred in the past year.

Dickinson stated further that a number of drug and prostitution investigations originated

in the area.  Scibetta characterized the area as having a lot of drug-related activity after

midnight, including shootings and robberies.

Whether or not a location is high in crime is a factual determination.  United

States v. Wright, 485 F.3d 45, 53 (1st Cir. 2007).  As the court elaborated in Wright:

> In most cases, the relevant evidence for this factual finding will include some combination of the following: (1) the nexus between the type of crime most prevalent or common in the area and the type of crime suspected in the instant case; (2) limited geographic boundaries of the "area" or "neighborhood" being evaluated; and (3) temporal proximity between evidence of heightened criminal activity and the date of the stop or search at issue.

Id. at 53-54 (internal citations omitted).  I find the officers' testimony credible and

conclude that the area of Brockton near Progressions Lounge, which includes the

intersection of Centre and Main Streets where Nelson was stopped by the officers (two

blocks south and one block west of Progressions), is a high crime area with regard to

gun violence.  Not only were there several instances of gun incidents prior to June 2,

2008, but a report of shots fired occurred that very evening, only moments before

Nelson was stopped by the officers.

---

[5] He could not recall the precise date of the gun battle but stated that it had been within a year of June 2008.

## II.    Conclusions of Law

"The oversight of brief investigatory stops has two aspects.  First, in order to make the initial stop, a police officer must have a reasonable, articulable suspicion of an individual's involvement in some criminal activity.  Second, any action undertaken pursuant to that stop must be reasonably related in scope to the stop itself unless the police have a basis for expanding their investigation."  United States v. Andrade, 551 F.3d 103, 109 (1st Cir. 2008) (internal quotation marks and citations omitted).  Although reasonable suspicion "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop."  Illinois v. Wardlow, 528 U.S. 119, 123 (2000).

"[T]he critical inquiry is whether reasonable suspicion arose under the totality of the circumstances."  Andrade, 551 F.3d at 110.  This inquiry "requires a practical, commonsense determination" that "entails a measurable degree of deference to the perceptions of experienced law enforcement officers."  United States v. Ruidiaz, 529 F.3d 25, 29 (1st Cir. 2008).  Here, the totality of the circumstances was sufficient to give Dickinson a reasonable and articulable basis for stopping Nelson.  It was late at night in a high-crime area.  The officers had received a report of shots being fired at Progressions moments earlier.  Nelson was observed walking with a group of individuals, one of whom (Martin) matched the exact description of the shooter.  The group was only two blocks south and one block west of Progressions and was walking west on Centre Street, away from the direction of Progressions.  It changed direction to

walk north on Main Street when it came upon the officers' marked patrol car, and Nelson ignored Dickinson's repeated orders to stop.

I do not suggest that any of these factors would provide support for a stop if viewed in isolation. However, when taken together they are sufficient. See Terry v. Ohio, 392 U.S. 1, 22-23 (1968) (basing reasonable suspicion on "a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation"); United States v. Sokolow, 490 U.S. 1, 9 ("Any one of these factors is not by itself proof of any illegal conduct . . . . [b]ut we think taken together they amount to reasonable suspicion.").

Defendant strenuously argues that Nelson's proximity to Martin cannot, standing alone, support a finding of reasonable suspicion that Nelson was involved in a crime. However, this is not the sole factor. In addition to the facts detailed earlier, the evidence showed that Nelson himself roughly matched the description of the shooter (albeit not with a black hat), and that he was observed mere blocks and coming from the area where the shooting had just occurred; on sighting the police he changed directions and refused to stop. Moreover and contrary to defendant's assertions, the fact that he was observed as part of a group which included someone directly matching the eyewitness description of the shooter is relevant to the totality of the circumstances. Defendant cites Ybarra v. Illinois, 444 U.S. 85, 86 (1979), and United States v. Jaramillo, 25 F.3d 1146, 1152 (2d Cir. 1994), but these cases are factually distinguishable. In Ybarra, police officers had obtained a warrant to search a bar and its bartender for drugs. Upon entering the bar the officers pat-frisked not just the

7

bartender but all of the customers in the bar, including Ybarra.  In suppressing the heroin found on Ybarra, the Supreme Court noted that the search warrant complaint did not allege that the bar was frequented by persons illegally purchasing drugs or that an informant had ever seen patrons of the bar purchasing drugs from the bartender, nor did the officers know anything in particular about Ybarra "except that he was present, along with several other customers, in a public tavern at a time when the police had reason to believe that the bartender would have heroin for sale."  444 U.S. at 91.  The Court concluded that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person."  Id.  Similarly, in Jaramillo, the defendant was a patron in a bar who was pat-frisked during a raid.  When the police entered the bar one officer observed an individual take a gun from his waistband and toss it into the lap of another person seated at his table; that person promptly tossed the gun to the floor.  As the officer was placing those two individuals against a wall Jaramillo came out of the nearby bathroom. The officer grabbed him and placed him against the wall as well; he was subsequently searched and a gun was found.  Jaramillo, 25 F.3d at 1147-48.  In suppressing the gun the court noted that "[t]here was no testimony that Jaramillo was recognized by the officers, or acted in any suspicious manner, or was known to have any connection with Cadavid, the gun tosser."  Id. at 1149.

The facts in Ybarra and Jaramillo do not comfortably fit with the facts of this case because Nelson's relationship to Martin was not one of "mere propinquity."  They were not strangers; it was not coincidence that they were at the same place at the same

8

time.  In Jaramillo, the court noted that the absence of a connection between the

defendant and the individual suspected of criminal behavior distinguished its case and

Ybarra from other cases in which probable cause had been found:

> The difference lies in the fact that while it is obviously reasonable to believe
> that individuals in a private home or vehicle have some connection with one
> another, it is not reasonable to assume that all of the persons at a public bar
> have such a connection.  The sole fact that an individual as to whom the
> officers have no reasonable and articulable factual suspicion of wrongdoing
> happens to be a in public place where another person possesses a weapon
> or contraband does not provide a basis for a Terry-type search if the
> possessor is a person with whom the searched individual has no known
> connection.

Id. at 1152.  Jaramillo suggests that an individual's proximity to another whom the

police suspect of criminal activity can be a relevant consideration when there is a

connection between the two individuals.  Other cases support this view.  See United

States v. Reyes, 225 F.3d 71, 75-76 (1st Cir. 2000) ("plainly reasonable" for officers to

consider defendant's presence in a car and entering and exiting a private residence

with others suspected of criminal activity in determining whether probable cause

existed to arrest defendant); United States v. McKie, 951 F.2d 399, 402 (D.C. Cir.

1991) (not a "mere propinquity" case when the defendant was observed walking with

and talking to suspected drug dealer at the very time and in the very place of the

suspected drug dealing and indications were that the defendant knew the suspected

drug dealer).

In any event, Ybarra did not hold that "mere propinquity" cannot be considered

as a factor in determining the legitimacy of a frisk; rather, it held that proximity cannot

be the sole legitimizing factor.  See Ybarra, 444 U.S. at 91 ("mere propinquity . . . does

9

not, <u>without more</u>, give rise to probable cause") (emphasis added); <u>see also</u> <u>United States v. Patrick</u>, 899 F.2d 169, 171 (2d Cir. 1990) (distinguishing <u>Ybarra</u> and finding probable cause when officials "knew something more about [defendant] than just his 'propinquity' to [another suspect]").  It is therefore proper to consider Nelson's proximity to Martin as part of the "totality of the circumstances" supporting the officers' reasonable suspicion.  <u>See</u> <u>Reyes</u>, 225 F.3d at 76; <u>McKie</u>, 951 F.2d at 402. Considering the entirety of the facts known to and observed by the officers, they were sufficient to create a reasonable suspicion that Nelson might be armed and dangerous.

The next question is whether the actions taken by Dickinson and Scibetta after the stop were reasonably related in scope to the circumstances which justified the stop. Although Dickinson did not complete a full pat-frisk of Nelson, he raised Nelson's arms over his head and kicked his feet apart.  This response was clearly reasonable in light of the report of shots being fired at Progressions and Nelson's evasive behavior, all of which supported a reasonable belief by the officers that he might be armed and dangerous.  <u>See</u> <u>Ruidiaz</u>, 529 F.3d at 33 ("Once an officer has formed a reasonable belief that a detained person may be armed and dangerous, a pat-down for protective purposes is, without more, deemed reasonably related in scope to the stop.").  Finally, the demonstration of the wearing of the shirt fully supports Scibetta's observation of a bulge under Nelson's shirt that looked like a large gun.  His search of Nelson's waistband was permissible.  <u>See</u> <u>United States v. Aitoro</u>, 446 F.3d 246, 253 (1st Cir. 2006) ("When an officer sees a bulge in a detainee's clothing and reasonably believes that bulge to be a concealed weapon, under the right circumstances the officer will

have license to search the detainee.").

Nelson challenges the admissibility of the statements he made at the police station solely based upon their status as the "fruit" of his seizure and search.  <u>See</u> <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963).  As the seizure and search were valid, they do not provide a basis for suppressing Nelson's statements.

**III.    Conclusion**

Defendant's motion to suppress all evidence obtained as a result of his seizure on June 2, 2008 (Docket # 19) is DENIED.

 

_____March 6, 2009_____          _____/s/Rya W. Zobel_____
DATE                                                      RYA W. ZOBEL
                                                 UNITED STATES DISTRICT JUDGE